# EXHIBIT A

Phillip R. Geurts (SBN 231320)
GEURTS LAW FIRM
17011 Beach Blvd. Suite 900
Huntington Beach, CA 92647
Telephone: 714-251-6694
Facsimile: 949-861-6155
Email: phil@geurtslawfirm.com

*Attorney for Plaintiff*
Shisha Aroma

Electronically FILED by
Superior Court of California,
County of Los Angeles
10/09/2023 9:16 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By T. Carlson, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| SHISHA AROMA, INC., A VIRGINIA CORPORATION,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>AIR DISTRIBUTION USA, INC., A CALIFORNIA CORPORATION; ROB MANESON, AN INDIVIDUAL; AND DOES 1 THROUGH 25, INCLUSIVE,<br><br>　　　　　Defendants. | Case No.: 23CMCV01619<br><br>**COMPLAINT**<br><br>1. Breach of Contract<br>2. Fraud<br>3. Breach of Implied Covenant of Good Faith and Fair Dealing |

Plaintiff SHISHA AROMA ("Plaintiff"), a Virginia corporation, by and through its

attorney of record, Phillip R. Geurts of Geurts Law Firm, brings this Complaint against

Defendants AIR DISTRIBUTION USA, INC. ("AIR Distribution"), a California corporation,

ROB MANESON, an individual, and DOES 1 through 25 (all defendants collectively referenced

as "Defendants"), and alleges on the basis of personal knowledge and/or information and belief

as follows:

COMPLAINT - 1

## PARTIES

1. Plaintiff is now, and at all relevant times herein mentioned was, a corporation duly organized and existing under and by virtue of the laws of the State of Virginia.

2. Plaintiff is informed and believes, and thereon alleges, that Defendant AIR DISTRIBUTION USA, INC. ("AIR Distribution") is a corporation organized under the laws of the State of California, with its principal office in Paramount, California.

3. Plaintiff is informed and believes, and thereon alleges, that Defendant ROB MANESON ("Rob") is now, and at all relevant times was, an individual over age 18, a resident of the Los Angeles County of California, and/or conducts business therein. Plaintiff is informed and believes that Defendant Rob was at all relevant times head of sales of Defendant AIR Distribution.

4. Each reference in this Complaint to any act or omission of a particular Defendant shall be deemed to mean that said Defendant and its officers, directors, agents, representatives, and employees did authorize such act while actively engaged in the management, direction, or control of that Defendant, and while acting within the course and scope of the employment or agency.

5. Plaintiff is ignorant of the true names and capacities of the Defendants named herein as DOES 1 through 25, inclusive, and therefore sues said Defendants by their fictitious names pursuant to California CCP sec. 474. Plaintiff is informed and believes, and on that basis alleges, that each of the Doe Defendants is in some manner legally responsible for the events, wrongs, and damages alleged in the Complaint and for Plaintiff's injuries and damages. The name, capacities, and relationships of Defendants Does 1 through 25 will be alleged by amendment to this Complaint when they become known to Plaintiff.

6. Plaintiff is informed and believes, and thereon alleges, Defendants, including Does 1 through 25, were agents, employees, subsidiaries, spouses, partners, affiliates, and/or representatives of the named defendants and/or are responsible in some way for the damages hereinafter alleged, and in doing the acts referred to herein, acted within the course and scope of its authority and with express and/or implied permission, knowledge, consent, and ratification of all said, other defendants.

7. The named Defendants and Doe Defendants are sometimes hereafter referred to, collectively and/or individually, as "Defendants."

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to California Constitution, Article VI, § 10 over this action brought for damages exceeding $25,000 for contract claims.

9. On information and belief, Plaintiff alleges that pursuant to California Code of Civil Procedure § 415.20, et seq., this Court has personal jurisdiction over the entity Defendants because they are believed, and at all times mentioned in this Complaint are believed to have been, located in and authorized to operate in the County of Los Angeles and/or organized and qualified to do business in California.

10. Venue is proper under California Code of Civil Procedure § 395.5 in Los Angeles County because the contract alleged to be breached was created and performed therein, and Defendants are residents and/or conduct business therein.

11. This action is brought within the applicable statutory time limits of California law.


## FACTS COMMON TO ALL CAUSES OF ACTIONS


COMPLAINT - 3

12. About March 2023, Plaintiff entered into a distribution agreement ("Agreement"), effective April 2023, with Plaintiff to serve as a non-exclusive distributor of tobacco products to Defendant AIR Distribution. A true and correct copy of the Agreement is attached as Exhibit 1 and incorporated herein.

13. As part of the Agreement, Defendant AIR Distribution agreed not to sell specified products ("Products") directly to any person except Plaintiff, USA Hookah, LLC., Shisha Aroma, Inc., Hookah Paradise USA, and Global Hookah, Inc. ("Direct Buying Customers") unless, within 30 days preceding the end of any quarter, Plaintiff failed to place orders sufficient to achieve its volume target.

14. Defendants, in violation and breach of their promises and obligations under the Agreement, sold Products to non-Direct Buying Customers at a price lower than what Plaintiff paid for the Products.

15. As a direct and proximate result of the aforesaid breach by Defendants, Plaintiff has suffered damages in an amount presently unknown but believed to be in excess of this Court's jurisdictional minimum and which will be established at trial according to proof.

### FIRST CAUSE OF ACTION

### (Breach of Contract)

### (Against all Defendants)

16. Plaintiff incorporates herein by reference each and every previous and subsequent allegation as though fully set forth herein.

17. Reference to "Defendants" within the first cause of action shall mean collectively Defendant AIR DISTRIBUTION USA, INC., Defendant ROB MANESON, and DOES 1 through 25.

COMPLAINT - 4

18. About March 2023, Plaintiff and Defendants entered into the Agreement, effective April 2023, for Plaintiff to serve as a non-exclusive distributor of tobacco products to Defendants.

19. As part of the Agreement, Defendants promised not to sell Products directly to any person except Direct Buying Customers unless, within 30 days preceding the end of any quarter, Plaintiff failed to place orders sufficient to achieve its volume target.

20. Defendants breached the Agreement by selling Products to non-Direct Buying Customers at a price lower than what Plaintiff paid for the Products.

21. Plaintiff has at all times performed the terms of the Agreement in the manner specified by the Agreement.

22. As a direct and proximate result of Defendants' acts and/or omissions, Plaintiff has suffered and will continue to suffer damages in an amount presently unknown but believed to be in excess of this Court's jurisdictional minimum, which will be established at trial according to proof.

## SECOND CAUSE OF ACTION

### (Fraud)

### (Against all Defendants)

23. Plaintiff incorporates herein by reference each and every previous and subsequent 4 allegation as though fully set forth herein.

24. Reference to "Defendants" within the second cause of action shall mean collectively Defendant AIR DISTRIBUTION USA, INC., Defendant ROB MANESON, and DOES 1 through 25.

COMPLAINT - 5

25. About March 2023, Plaintiff and Defendants entered into the Agreement, effective April 2023, for Plaintiff to serve as a non-exclusive distributor of tobacco products to Defendants.

26. Defendants specifically promised not to sell Products directly to any person except Direct Buying Customers unless, within 30 days preceding the end of any quarter, Plaintiff failed to place orders sufficient to achieve its volume target.

27. At the time Defendants made the promise to Plaintiff, the Defendants had no intention of performing it.

28. The promise was made by Defendants with the intent to induce Plaintiff to enter into the Agreement.

29. Plaintiff, at the time this promise was made, was ignorant of Defendants' secret intention not to perform as promised and Plaintiff could not, in the exercise of reasonable diligence, have discovered the Defendants' secret intention. In reliance on the promise of Defendants, Plaintiff entered into the agreement and began to perform under the 11 Agreement.

30. Defendants failed to abide by their promise by selling Products to non-Direct Buying Customers at a price lower than what Plaintiff paid for the Products.

31. Plaintiff, at the time these representations were made by Defendants and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' representations and believed them to be true. In reliance on these representations, Plaintiff was induced to and did enter into the Agreement and began to perform under the Agreement. Had Plaintiff known the actual facts, Plaintiff would not have taken such

COMPLAINT - 6

action. Plaintiff's reliance on the Defendants' representations was justified because no reasonable basis existed to suggest that Defendants would not fulfill their representations.

32. As a proximate result of the fraudulent conduct of Defendants as herein alleged, Plaintiff has suffered and will continue to suffer damages in an amount presently unknown but believed to be in excess of this Court's jurisdictional minimum, which will be established at trial according to proof.

33. The aforementioned conduct of Defendants was an intentional misrepresentation, deceit, and/or concealment of a material fact known to Defendants with the intention on the part of Defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

## THIRD CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

### (Against all Defendants)

34. Plaintiff incorporates herein by reference each and every previous and subsequent allegation as though fully set forth herein.

35. Reference to "Defendants" within the third cause of action shall mean collectively Defendant AIR DISTRIBUTION USA, INC., Defendant ROB MANESON, and DOES 1 through 25.

36. About March 2023, Plaintiff and Defendants entered into the Agreement, effective April 2023, for Plaintiff to serve as a non-exclusive distributor of tobacco products to Defendants. Defendants specifically promised not to sell Products directly to any person

COMPLAINT - 7

except Direct Buying Customers unless, within 30 days preceding the end of any quarter, Plaintiff failed to place orders sufficient to achieve its volume target.

37. Defendants at all times relevant herein, had a duty to act fairly and in good faith with Plaintiff in meeting their responsibilities under the Agreement.

38. Defendants breached their duty by selling Products to non-Direct Buying Customers at a price lower than what Plaintiff paid for the Products.

39. As a direct and proximate result of Defendants' breach, Plaintiff has suffered and will continue to suffer damages in an amount presently unknown but believed to be in excess of this Court's jurisdictional minimum, which will be established at trial according to proof.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For compensatory damages according to proof;

2. For investigative costs and fees according to proof;

3. For reasonable attorney's fees according to proof and to the extent allowed by law;

4. For costs of suit according to law;

5. For general damages according to proof;

6. For punitive damages, if and to the extent allowed by law;

7. For interest provided by law, including without limit, pursuant to California Civil Code § 3291; and

8. For such other and further relief as the Court deems just and proper.

DATED: October 6, 2023                    GEURTS LAW FIRM

COMPLAINT - 8

1

2

By: _____
        Phillip N. Geurts
        *Attorney for Plaintiff*
        Shisha Aroma, Inc.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT - 9**

## NON-EXCLUSIVE DISTRIBUTION AGREEMENT

THIS NON-EXCLUSIVE DISTRIBUTION AGREEMENT (this "**Agreement**") is effective as of April 1, 2023, (the "**Effective Date**") by and between AIR Distribution USA, Inc., a California corporation, with its principal place of business at 14931 Gwenchris Ct, Paramount, CA 90723 ("**Seller**"), and the party indicated below with its principal place of business as indicated below ("**Distributor**").

Distributor Name: _____Shisha Aroma, Inc._____

Address: _____7311 Highland St Ste 5, Springfield, CA 22150_____

Primary Contact/Title: _____Ramzi Haifawi, President_____

Email: _____shishaaroma@gmail.com_____

Seller is a licensed importer of tobacco products, and desires to bring certain of its products to market through a network of distributors. Seller and Distributor desire that Distributor serve as a non-exclusive distributor of certain Seller products in accordance with the terms and conditions of this Agreement. In consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties agree to the Terms and Conditions below.

| SELLER: | DISTRIBUTOR: |
|---|---|
| By: | By: |
| _____ Signature | _____ Signature |
| Rob Maneson | Ramzi Haifawi |
| _____ Printed Name | _____ Printed Name |
| Head of Sales | President |
| _____ Title | _____ Title |
| | 3/9/2023 |
| _____ Date | _____ Date |

## Terms and Conditions

### 1. Appointment; Scope.

(a)    Appointment. Subject to the terms and conditions of this Agreement, Seller hereby appoints Distributor and Distributor hereby accepts appointment, during the Term, as a non-exclusive distributor of the list of Seller's products as provided by Seller to Distributor on a periodic basis ("**Products**") for purposes of marketing, displaying, promoting, advertising, selling, delivering, and distributing such Products to end customer (each, a "**Customer**"). This appointment of Distributor is non-exclusive and Seller reserves the right to sell and promote, and to appoint other distributors to sell and promote, directly or indirectly, Products and other products of Seller. Distributor shall not appoint any subdistributors, sales agents, or other persons or entities to promote, demonstrate, distribute, or sell Products, or otherwise delegate to any person or entity any of Distributor's rights or obligations under this Agreement, unless agreed to in writing by Seller.

(b)    No Bundling or Combination. Distributor shall not bundle or combine Products with any other products or third party products without the express written consent of Seller, in its sole discretion. Further, under no circumstances shall Distributor combine, relate, associate or bundle Products with any third party product or services.

(c)    Distributor's Operations and Expenses. The detailed operations of Distributor under this Agreement are subject to the sole control and management of Distributor. Distributor shall provide, at its own expense, such office space and facilities, and hire and train such personnel, as may be necessary to carry out its obligations under this Agreement. Distributor shall be solely responsible for its expenses incurred in the performance by Distributor of its obligations under this Agreement or otherwise, including all travel, lodging and entertainment expenses of its employees, consultants and agents, whether relating to the performance of this Agreement, attending training sessions, or otherwise.

(d)    Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. Distributor shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement or undertaking with any third party.

(e)    No Franchise. The relationship between Seller and Distributor does not, and is not intended to, constitute or create a franchise. Seller is not a franchisor and Distributor is not a franchisee. Distributor acknowledges that it has not paid a franchise fee of any kind to Seller to enter into this Agreement. The parties acknowledge that (i) there is no community of interest between Distributor and Seller, and (ii) Distributor's business is not substantially associated with the Licensed Items (as defined in Section 10(a)).

(f)    Direct Sales by Seller or its Affiliates. Seller retains the right to sell Products directly (or through one or more of its Affiliates (as defined below)) to Customers. Distributor may from time to time receive requests from a current or prospective Customer to deal

113875732

directly with Seller. Distributor shall promptly refer all such requests to Seller. In such situations, Distributor and Seller may discuss what amounts, if any, Seller should pay to Distributor in consideration of Distributor referral of such request to Seller. In no event shall Distributor's referrals under this Section 1(f) be deemed or be construed to constitute or create a sales agency or sales representative arrangement or agreement between Distributor and Seller (or any of its Affiliates).

(g)     Internet Sales. Distributor is hereby granted the right to sell Products via the internet but subject to such additional terms and conditions that Seller may from time to time establish and send to Distributor. This authorization in this Section 1(g) can be revoked by Seller at any time for any reason upon written, prior notice to Distributor.

(h)     No Bribery; No Kickback. Distributor shall not, directly or indirectly, give, offer, promote, authorize or allow to be given, offered or promised, money, gifts or anything of value to any third party (including but not limited to agents or subdistributors of Distributor), or employee, officer and/or agent of Seller, while knowing or having reason to know that such thing of value is to be given, offered or promised to such third party, or employee, officer and/or agent of Seller, in order to (i) improperly influence any act or decision of such third party, or employee, officer and/or agent of Seller, or (ii) improperly induce such third party, and/or employee, officer and/or agent of Seller to use her/his influence to affect or influence any act or decision of any third party (including but not limited to agents or subdistributors of Distributor), or employee, officer and/or agent of Seller for the purpose of assisting Seller in obtaining or retaining business, in directing business to any person, or in securing any improper advantage.

**2.     Promotion of Products.** Distributor shall use its commercially reasonable efforts to promote and sell Products.

**3.     Terms and Conditions of Sale.**

(a)     Orders for Products. Distributor shall order Products from Seller by submitting a written purchase order identifying the type and quantity of Products it wishes to purchase, the requested delivery date(s), export information required to enable Seller to fill the order, and such other information as Seller may from time to time request. If requested by Seller, Distributor shall use a form of purchase order provided by Seller or place orders through Seller's electronic ordering system. Seller may ship and invoice for a quantity less than the quantity specified in Distributor's purchase order and Distributor must accept and pay for such lesser quantity. All orders for Products are subject to Seller's reasonable review and acceptance consistent with this Agreement. Seller shall have no liability to Distributor with respect to purchase orders that are not accepted; provided, however, that Seller shall not unreasonably reject any purchase order for Products. If Products are in short supply, Seller may allocate the available supply of Products to any or all of its customers in such a manner as Seller, in its sole and absolute discretion, deems appropriate.

(i)     Initial Purchase Order. Upon execution of this Agreement Distributor is required to submit a purchase order for a minimum of at least 14,570 Products.

(ii)     Volume Targets. Each quarter and calendar year during the Term (as defined below in Section 11), Distributor shall purchase the amount of Products required to meet the individual Product volumes (the "**Volume Target(s)**") and the overall volume targets (the "**Overall Volume Target(s)**") each set forth on Schedule A, attached hereto and incorporated by reference herein.

(b)     Product Pricing.

(i)     Invoicing and Product Pricing. Seller shall invoice

Distributor for all Products supplied by Seller to Distributor under this Agreement. Unless otherwise agreed by the parties on a case-by-case basis, the pricing for each Product supplied by Seller under this Agreement will be Seller's then-current prices for Products (as modified from time to time pursuant to Section 3(b)(ii), the "**Product Pricing**"). Distributor acknowledges that Seller has provided Distributor with a copy of the Product Pricing in effect as of the Effective Date.

(ii)     Changes to Product Pricing. Seller reserves the right to change the prices of Products at any time upon 30 days prior notice. Unless a different date is specified in a notice, the change to the Product Pricing will take effect immediately after the 30 day notice period. No change to the Product Pricing shall affect (1) purchase orders submitted by Distributor and accepted by Seller prior to the date such change becomes effective, or (2) outstanding invoices. If Distributor does not accept Seller's changes to the Product Pricing, Distributor has the right to terminate this Agreement upon 60 days' prior notice; provided, that such notice must be given within 10 days after the date Distributor was notified of the change to the Product Pricing. If Distributor elects not to give notice of termination under this Section 3(b)(ii) within the specified period of time, Distributor hereby waives its right to terminate this Agreement based on the given change to Product Pricing.

(iii)     Trade Discounts. Distributor's trade discounts ("**Incentives**") are set forth in Schedule B, attached hereto and incorporated by reference herein. Seller reserves the right, in its sole discretion, to change the price of Products or the Incentives relating thereto at any time with or without notice to Distributor, except as set forth in Section 3(b)(ii) above. Seller shall pay Distributor for Incentives in accordance with the payment schedule set forth in Exhibit B.

(c)     Payment Terms; Currency. Unless otherwise specified on the applicable invoice, all payments hereunder are due, and Distributor shall pay the amounts specified on the applicable invoice, within 30 days after the date of such invoice. Unless otherwise specified in the Product Pricing, all amounts due and payable to Seller shall be paid in United States dollars. Distributor shall not make any deduction or offset of any kind from any payments due to Seller unless approved in writing by Seller. Seller shall invoice Distributor for all Products supplied by Seller to Distributor under this Agreement. Unless otherwise agreed by the parties on a case-by-case basis, the pricing for each Product supplied by Seller under this Agreement will be Seller's then-current prices for Products (as modified from time to time) (the "**Product Pricing**"). Distributor acknowledges that Seller has provided Distributor with a copy of the Product Pricing in effect as of the Effective Date. Unless otherwise specified on the applicable invoice, all payments hereunder are due, and Distributor shall pay 100% of the amounts specified on the applicable invoice prior to shipment of the Products. Unless otherwise specified in the Product Pricing, all amounts due and payable to Seller shall be paid in United States dollars. Distributor shall not make any deduction or offset of any kind from any payments due to Seller. All taxes, now or hereafter imposed with respect to the transactions contemplated hereunder (including sales, use taxes, and value added taxes, customs and excise taxes or duties and other similar taxes or duties where applicable, but excluding income taxes or other taxes imposed upon Seller and measured by the gross or net income of Seller) are the responsibility of Distributor, and, if paid or required to be paid by Seller, the amount thereof shall be added to and become a part of the amounts payable by Distributor hereunder.

(d)     Responsibility for Taxes and Duties. All taxes, now or hereafter imposed with respect to the transactions contemplated hereunder (including sales, use taxes, and value added taxes, customs

and excise taxes or duties and other similar taxes or duties where applicable, but excluding income taxes or other taxes imposed upon Seller and measured by the gross or net income of Seller) are the responsibility of Distributor, and, if paid or required to be paid by Seller, the amount thereof shall be added to and become a part of the amounts payable by Distributor hereunder.

(e)    Shipping Terms; Title. Unless otherwise expressly agreed by Seller (with reference to this Section 3(e)), terms of shipment of Products shall be communicated by Seller at the time of order. Unless otherwise requested by Distributor, Seller shall arrange for and select the carrier(s) to be used in shipping Products to the destination designated by Distributor. Title to Products shipped to Distributor hereunder passes to Distributor upon transfer to the carrier at Seller's location. All delivery dates are approximate and Seller shall not be liable in case of late delivery. The invoice for each shipment of Products will include the applicable Product Pricing, plus shipping and insurance costs and other amounts payable by Distributor under this Agreement.

(f)    Non-Conforming Shipments. All claims for non-conforming shipments must be made in writing to Seller within 10 calendar days after the date on which the relevant shipment arrives at the destination designated in the applicable purchase order. Any claims not made within such period shall be deemed waived and released. Seller shall be permitted to inspect the non-conforming shipment. If Seller agrees with Distributor that the shipment is non-conforming, Seller shall, at its option and at no additional expense to Distributor replace or supplement the non-conforming shipment so that it does conform to the applicable order.

(g)    Returns. No returns of Products are allowed.

(h)    Packaging. Unless Distributor requests otherwise, all Products ordered by Distributor must be packed for shipment and storage in accordance with Seller's then-current commercial practices. It is Distributor's obligation to notify Seller of any special packaging requirements (which will be at Distributor's expense to the extent Seller agrees to such requirements). Distributor shall not distribute, deliver, market, or sell any Products for which the packaging is damaged or unsealed or for which the shelf life has expired as shown on the package. Distributor shall be solely liable for any damage to or unsealing of packaging unless Distributor notifies Seller of such defect within 10 calendar days of the date on which Distributor receives the relevant Products, as referred to above. Seller shall have no liability or responsibility to Distributor in the event of expiration of the shelf life of a Product.

(i)    Distributor Financial Status. Distributor represents and warrants to Seller on a continuing basis that Distributor is in good substantial financial condition and able to pay all bills when due. Distributor shall, from time to time (and, at the minimum, on quarterly basis), furnish any financial statements or additional information as may be reasonably requested by Seller in order to enable Seller to determine Distributor's financial condition and creditworthiness. Additionally, Distributor authorizes Seller to request and obtain financial information regarding Distributor from credit reporting agencies, Distributor's banks and suppliers, and other such sources. Seller may, in its sole discretion, from time to time assess the creditworthiness of Distributor and increase or decrease the amount of credit that Seller has extended to Distributor, if any, in connection with the purchase of Products under this Agreement. Prior to the Effective Date, and upon reasonable request from Seller, Distributor shall provide Seller with documentation on its financial condition. Such documentation shall include, but not be limited to, last three years of corporate and personal federal and state income tax returns, last two months of bank statements, last two fiscal years of system-generated financial statements, including balance sheet and income statement,

interim year to date system-generated financial statements including balance sheet and income statement. Distributor shall be required to make full payment on an invoice and have no outstanding amounts due to Seller prior to shipment, should it fail to provide the requested information.

(j)    Past Due Accounts. If Distributor becomes delinquent in payment obligations hereunder, or fails to meet other credit or financial requirements established by Seller, or, if in the sole judgment of Seller, Distributor's credit becomes impaired, Seller may exercise any or all of the following rights and remedies in addition to any other rights or remedies provided in this Agreement or by Applicable Law:

(i) All amounts due and owing to Seller hereunder but not paid by Distributor on the due date thereof will bear interest in U.S. dollars at the lower of 18% per annum or the maximum lawful interest rate permitted under Applicable Law, which interest will accrue on the balance of outstanding unpaid amounts from the date on which such amounts become due and owing until payment thereof in full.

(ii) Seller may, in its sole discretion, defer or suspend shipping Products to Distributor if Distributor exceeds its credit limit or Distributor's account is past due.

(iii) Seller may refuse to accept any new orders from Distributor, may cancel or delay shipment of any orders accepted previously, and may stop any shipments in transit;

(iv) Seller may refuse to extend further credit to Distributor and may require advance payment for new orders;

(v) Seller may declare all outstanding amounts due and payable, notwithstanding any credit terms previously in effect;

(vi) Seller may require the return of all or any portion of Products in Distributor's inventory, as Seller sees fit, and Seller will then be obligated to credit or pay Distributor's original net invoice cost paid by Distributor, less any and all freight.

(vii) Distributor agrees to the terms and conditions of the Personal Guarantee Requirements set forth in Schedule C, attached hereto and incorporated by reference herein.

(k)    Right to Require Payment in Advance. Seller has the right to require Distributor to pay for Products in advance, either by way of an irrevocable letter of credit in favor of Seller, cash-in-advance, cash-on-delivery, or other method acceptable to Seller if (i) Distributor has failed to make payments due to Seller within the required period of time, (ii) Seller has a reasonable concern about Distributor's ongoing ability to pay invoices as they become due, or (iii) a party has given notice of termination or non-renewal of this Agreement.

(l)    Standard Forms. In connection with the purchase by Distributor of Products hereunder, Seller and Distributor may employ their respective forms of purchase order, order acknowledgement, invoice, and other standard documents (collectively, "Standard Forms"). Use of Standard Forms is for convenience only and no term or condition set forth in any Standard Form will operate to modify, delete, or supersede any term or condition of this Agreement. Seller's sale of Products to Distributor hereunder is hereby expressly made conditional on the terms and conditions of this Agreement to the exclusion of all other terms and conditions.

(m)    Seller's Affiliates. Distributor acknowledges that some or all Products are manufactured by or for entities that are controlled by, under common control with, or which control Seller (each, an "Affiliate"). Manufacturing and shipment of any Products to Distributor from Seller's Affiliates shall be deemed a sale under this Agreement and shall not be deemed, or be construed to be, separate, an individual sales outside of this Agreement, nor will such actions create, nor be deemed to create any privity of contract, a separate distributorship arrangement, sales agency, or other relationship

between Distributor and any of Seller's Affiliates. Distributor acknowledges that all disputes regarding purchase orders, invoices, or any other matter that Distributor may have involving or relating to any shipment of Products by an Affiliate of Seller shall be asserted solely against Seller and shall be resolved in accordance with this Agreement. Distributor hereby waives any and all rights it may have to pursue such matters outside of this Agreement.

(n)     Other Distributor Obligations. Distributor represents and warrants during the Term that it shall: (1) notify Customers that Products should only be used for the purposes and in the manner for which they were designed and supplied, and that warning notices should not be removed or obscured, (2) pass through all instructions and information provided by Seller to Customers, (3) not remove or obscure any warning notices displayed on Products, (4) not breach any Customer agreement; (5) not mishandle or use the Products or Licensed Items in an unauthorized manner or authorize or promote a Customer to do so; and (6) not make any statements, claims, representations or warranties relating to Products, other than as authorized or made by Seller in writing.

(o)     Unilateral Policy. Distributor acknowledges that Distributor has been informed of Seller's Brand Recognition Policy as it applies to the advertisement for sale of the Products in the United States. There is no agreement, express or implied, between Seller and Distributor with respect to the advertised or resale pricing of the Products. If any director, officer, employee, representative, or other agent of Seller tries to coerce a reseller to agree to the price at which reseller advertises or resells the Products, such action shall be considered void, unauthorized, and without effect and Distributor shall promptly notify Seller's authorized representative.

## 4. Legal and Regulatory and Other Compliance Obligations.

(a)     General Obligation to Comply with Applicable Law. Distributor shall, at its sole cost and expense, comply with all applicable laws, rules, regulations, decrees, and other requirements (as each of the foregoing may be amended or modified from time to time) (collectively, **"Applicable Law"**) relating to or affecting this Agreement, Products (including their sale, transfer, handling, storage, use, disposal, export, re-export, and transshipment), the activities to be performed by Distributor hereunder, or the facilities and other assets used by Distributor in performing its obligations under this Agreement, including the tobacco laws and regulations applicable to their respective operations.

(b)     Anti-Bribery Laws and Policies. Without limiting the generality of Section 4(a), Distributor shall, at its sole cost and expense, comply with the U.S. Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act, the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, and all applicable anti-bribery and anti-corruption legislation. In connection with this Agreement, and as required under the FCPA, and as required under this Agreement, Distributor shall not, directly or indirectly, give, offer, promote, authorize or allow to be given, offered or promised, money, gifts or anything of value to a Government Official (as defined below), while knowing or having reason to know that such thing of value is to be given, offered or promised to a Government Official, in order to (i) improperly influence any official act or decision of such Government Official, or (ii) improperly induce such Government Official to use her/his influence to affect or influence any act or decision of any government entity (including any department, agency or instrumentality thereof, or any entity owned or controlled by such government(s)), for the purpose of assisting Seller in obtaining or retaining business, in directing business to any person, or in securing any improper advantage. For the purpose of this Agreement, the term **"Government Official"** includes (1) any officer, employee, agent or representative of a

national, state, regional or local governmental body, department, agency or any instrumentality thereof (including any subdivision or branch thereof); (2) any person acting in an official capacity or performing public duties or functions on behalf of such governmental body, department, agency or instrumentality; (3) any officer, employee, agent or representative of a business or corporate entity owned or controlled by any such governmental body; (4) any political party or political party official; (5) any candidate for public office; and (6) any officer, employee or representative of a public international organization (e.g., World Bank, International Monetary Fund, or United Nations). If Distributor is a natural person, Distributor hereby represents that he is not a Government Official and agrees that her/he will not become a Government Official or employ any Government Official during the Term. Distributor further represents that no Government Official will derive any benefit, directly or indirectly, from any compensation paid to Distributor in connection with this Agreement. Distributor shall notify Seller immediately of any solicitation, demand or other request for a bribe, gift or anything of value relating to any activities performed by Distributor pursuant to this Agreement.

(c)     U.S. Export Laws and Regulations. U.S. Export Laws and Regulations. Distributor acknowledges and agrees that each Product (for purposes of this Section, the **"Items"**), may be subject to the export controls of the United States government, of the government of any country in which Distributor is organized and/or located, and of any government in territories Distributor resells or delivers Products. Such export controls, in the case of the United States, may include the U.S. Department of Commerce (the **"EAR"**), which control and may restrict the export of Items from the United States and their re-export from other countries, and the statutes, Executive Orders, and regulations administered by the Office of Foreign Assets Control, U.S. Department of the Treasury (the **"OFAC regulations"**), which restrict trade by U.S. persons or from the United States, and may restrict trade outside the United States involving any U.S.-origin items, with designated restricted countries and persons. Distributor shall comply, and shall cause each of its partners, employees, agents and representatives to comply, with the EAR and the OFAC regulations, as applicable, and all other Applicable Law relating to the export, re-export, transshipment, and diversion of any Item, and without limiting the foregoing, shall not, without first obtaining permission to do so from the appropriate government agencies and from Seller, as required: (i) export, re-export, transship, or divert any Item (a) to or into any of those countries listed from time to time in the EAR or OFAC regulations as countries subject to embargo or restrictions tantamount to an embargo (currently, Cuba, Iran, Sudan, Syria, North Korea, and the Crimea region of Ukraine), (b) or to any persons, either individuals or entities, subject to restrictions under the EAR or OFAC regulations, including those appearing on the Denied Persons or Entity lists under the EAR, or the Specially Designated Nationals and Blocked Persons, Foreign Sanctions Evaders, and Sectoral Sanctions Identification lists under the OFAC regulations, and any comparable lists maintained by any other relevant governmental authority, or (c) for use in connection with any prohibited proliferation-related activities or related projects; or (ii) export, re-export, transship, divert, transfer, distribute, or sell any Item to an individual or entity if Distributor knows or should know that such individual or entity intends to export, re-export, transship, divert, transfer, distribute, or sell the Item to any such embargoed country or person or intends to use or allow others to use the Item in connection with prohibited proliferation-related activities. Distributor shall cooperate fully with Seller in any official or unofficial audit or inspection related to the export control laws or regulations of the U.S. government. Distributor further acknowledges and agrees that other countries from which Seller or its Affiliates may ship Products to Distributor may have export controls similar or dissimilar to those described in this Section 4(c), and that Distributor is likewise required

to comply with such other export controls.

    (d)    <u>Licensing.</u>

    (i) <u>Distribution and Sale of Products.</u> Unless otherwise specified by Seller, Distributor shall, at its sole cost and expense, obtain such product registrations, re-registrations, licenses, permits, authorizations, consents, and approvals as may be necessary for Distributor to distribute and sell Products to Customers. Each party shall provide such assistance as the other party may reasonably request in connection with obtaining such product registrations, licenses, permits, authorizations, consents, and approvals.

    (e)    Each party hereby represents, warrants, covenants and certifies that no agent, Affiliate, employee, or other person associated with or acting on behalf of such party, directly or indirectly has in the past offered, or will in the future offer, to pay or provide anything of value in the form of any unlawful contribution, gift, entertainment, or other unlawful expense to any foreign official or foreign political party for the purpose of gaining or retaining business or obtaining any unfair advantage, and such party has not violated nor will violate in the future any provision of the Foreign Corrupt Practices Act, nor has such party made nor will such party in the future any bribe, rebate, influence payment, kickback, or other similar unlawful payment. The parties hereby represent, certify and warrant that they are now, and in the future will remain compliant with all export control statutes, regulations, decrees, guidelines, policies, and economic sanctions, of the United States government and the government of any country in which the parties conduct business pursuant to this Agreement.

    (f)    <u>Required Disclosure.</u>    Notwithstanding Section 16 (Confidentiality), Seller shall have the right to disclose the existence and terms of this Agreement to appropriate governmental authorities if in Seller's sole discretion it considers that such disclosure is legally mandated or otherwise appropriate.

## 5. Other Obligations of Distributor.

    (a)    Incident Reports.

    (i) <u>Reporting Obligations.</u> Distributor shall report to Seller within five business days all complaints, reports, notices, or comments of any kind (including complaints, reports, notices, or comments from a Customer or any governmental entity or standards body that any of the documentation relating to any Product is inadequate or relating to any allegation of deficiencies related to the identity, quality, durability, reliability, safety, effectiveness, or performance of any Product) received by Distributor from any Customers or from any governmental entity or standards body in any form relating to adverse events or failures to meet applicable industry standards of or involving any Products. If Distributor has any doubt as to whether a particular incident, near incident, complaint, report, notice, or comment should be reported to Seller under this Agreement, Distributor shall err on the side of over inclusiveness and report promptly such incident, near incident, complaint, report, notice, or comment to Seller.

    (ii) <u>Investigations.</u> Distributor shall assist Seller as necessary in investigating any incidents and near incidents, and all complaints, reports, notices, or comments of any kind received by Distributor from Customers or from any governmental entity in any form relating to adverse events, injuries, or malfunctions of or involving any Products. Distributor shall not file any incident or near incident reports with any government authority and shall not initiate the recall of any Products for any reason without prior consultation with Seller unless required by Applicable Law. All documents and information which Distributor is required to furnish or deliver to Seller and its representatives and to government authorities hereunder shall be so furnished or delivered at no cost to Seller.

    (iii) <u>Record Keeping.</u>    Distributor shall maintain true and complete records (1) of all Products that are delivered to each Customer (including for purposes of facilitating prompt Product tracking, correction, and recall) and (2) of all incidents, near incidents, complaints, reports, notices, and comments described in Section 5(a)(i). Upon request of Seller, Distributor shall provide Seller with copies of all records maintained under this Section 5(a).

    (iv) <u>Recalls.</u> In the event of the occurrence of a recall or field corrective action of or for any Product, Distributor shall reasonably cooperate with Seller in implementing and completing corrective action.

## 6. Seller's Obligations.

    (a)    <u>Volume Targets.</u> Each quarter and calendar year during the Term, Seller shall supply Distributor with enough Product to meet the Volume Targets and Overall Volume Targets.

    (b)    <u>Limited Distribution by Seller.</u> During the Term, Seller agrees not to sell Products directly to any person except USA Hookah, LLC., Shisha Aroma, Inc., Hookah Paradise USA, Rose ML, Inc. and Global Hookah, Inc ("Direct Buying Customers") unless within 30 days preceding the end of any quarter Direct Buying Customers fail to place orders sufficient to achieve any quarter's Overall Volume Target.

    (c)    <u>Special Consideration for Global Hookah, Inc.</u> Seller agrees that the quarter and calendar year Volume Targets and Overall Volume Targets shall be reduced pro rata based on respective volumes among the Direct Buying Customers in the event Global Hookah, Inc.'s volume increases beyond the Volume Targets and Overall Volume Targets set for Global Hookah, Inc as set forth in Exhibit A by an amount equal to the increase. Seller shall report any such increase, if applicable, at the end of any quarter and which is not subject audit or review by Distributor.

## 7. Modification of Products.

    (a)    <u>Removal of Products.</u> Seller may, upon reasonable notice to Distributor, remove Products from its offerings in its sole discretion. Distributor acknowledges and agrees that the right of Seller to remove Products under this Section 7(a) is reasonable and necessary to ensure that Seller retains sufficient flexibility in its Product offerings and to address market conditions.

    (b)    <u>Modifications to Products by Seller.</u> Seller has the right, at any time and without notice, to make modifications to any Products that do not materially affect function of such Products or which are required by Applicable Law or which are necessary to comply with applicable standards or safety criteria. If a modification would have such a material effect, Seller shall use commercially reasonable efforts to give Distributor reasonable notice of such modification.

    (c)    <u>No Modifications by Distributor.</u> Distributor may not customize, modify, or have customized or modified, any Product (or Product label, instruction, or documentation) unless it obtains the prior consent of Seller, which consent may be withheld in the sole discretion of Seller. Any unauthorized customization or modification of any Product (or Product label, instruction, or documentation) by Distributor or any third party (including but not limited to agents or subdistributors of Distributor) shall relieve Seller from any obligation it would otherwise have had with respect to such Product.

**8. English Language.** This Agreement is in the English language only, which language is controlling in all respects, and all versions hereof in any other language will not be binding on the parties hereto. All communications and notices to be made or given pursuant to this Agreement must be in the English language.

**9. Records and Audits.** During the Term and for a period of seven years thereafter (or such longer period as required under Applicable

Law), Distributor shall maintain documentation and records sufficient to demonstrate its compliance with the requirements of this Agreement (including Distributor's compliance with all Applicable Law). Upon reasonable notice from Seller, Distributor shall provide Seller or its agents with access to Distributor's premises during normal business hours to examine or copy all records requested by Seller or otherwise relevant to determine whether Distributor is in compliance with the requirements of this Agreement (including Distributor's compliance with Applicable Law); provided, that Seller shall require treatment of (and shall require its agents to treat) such documentation and records as Confidential Information under this Agreement.

## 10. Use of Seller's Marks and Content.

(a)     License Grant. Subject to the terms and conditions of this Agreement, Seller hereby grants to Distributor a non-exclusive, non-transferable, license to use such trademarks, trade names, service marks, logos, and other marks of Seller, or Seller's Affiliates, relating to Products and such graphics, designs, descriptions, and other works of authorship, in each case as Seller may from time to time specify (collectively, the "**Licensed Items**") solely in connection the promotion and sale of Products. Distributor may identify itself as an authorized distributor of Products in connection with all activities related thereto and not to use any other trademark, trade name, or logo to identify Products. Distributor shall not attach any additional trademarks, trade names or logos to Products. Distributor shall use the Licensed Items in accordance with the terms and conditions of this Agreement and with good trademark and copyright practices, including by protecting the value of the goodwill associated with the Licensed Items. Each initial use of the Licensed Items by Distributor shall be subject to Seller's prior written approval. Distributor shall not modify or create any derivative works of any Licensed Item.

(b)     Quality Control. Distributor acknowledges that the nature and quality of all advertising, promotional, and other items and uses relating to Products that use any of the Licensed Items must conform to standards set by, and be under the control of, Seller. Distributor shall comply with any guidelines regarding the use of the Licensed Items that Seller may from time to time provide to Distributor in writing.     Distributor shall reasonably cooperate with Seller in facilitating Seller's control of the nature and quality of the advertising, promotional, and other items that are used by Distributor to market, advertise, distribute, or sell Products. Distributor shall not use, or permit to be used, the Licensed Items in connection with any goods or services that are defamatory, offensive, or obscene or that may otherwise harm the goodwill or commercial reputation of Seller or in any manner that would bring the Licensed Items into disrepute or that would jeopardize or invalidate their registrations, applications, or goodwill. Distributor shall use appropriate trademark, copyright, or other symbols wherever appropriate and as directed by Seller.

(c)     Ownership: Goodwill.   Distributor acknowledges that Seller owns all right, title and interest in and to all Licensed Items and any of Seller's other names, logos, trademarks, trade dress, service marks, designs, marks, domain names, patents, copyrights or copyrighted material, or other intellectual or proprietary property intellectual property relating to Products (the "**Seller Intellectual Property**"), worldwide and the goodwill associated with the same. All goodwill created by Distributor's use of the Seller Intellectual Property shall inure to the benefit of Seller. Distributor hereby assigns to Seller all rights it may acquire by operation of law or otherwise in the Seller Intellectual Property, including all applications or registrations therefor, along with the goodwill associated therewith. Distributor shall execute and deliver to Seller all documents necessary to protect and/or register the Seller Intellectual Property. Except as provided Section 10(a), nothing in this Agreement shall be construed to grant to Distributor any right, title, interest, or license in or to the Seller

Intellectual Property. Distributor shall not contest the validity of, by act or omission jeopardize, or take any action inconsistent with, Seller's rights or goodwill in any Seller Intellectual Property in any country, including by attempted registration of any Seller Intellectual Property, or, in the case of the Seller Intellectual Property, use or attempt registration of any confusingly similar mark or domain name.

(d)     Enforcement. Distributor shall promptly notify Seller of any known, threatened, or suspected infringement, imitation, or unauthorized use of the Seller Intellectual Property by any third party (including but not limited to agents or subdistributors of Distributor) of which it becomes aware.   Seller, in its sole discretion, shall determine what action, if any, should be taken in response to any infringement, imitation, or unauthorized use of the Seller Intellectual Property. Distributor shall take no action to enforce any rights in the Licensed Items against any third party without the prior approval of Seller, which Seller may withhold in its sole discretion. Distributor shall use commercially reasonable efforts to cooperate with Seller's efforts in connection with enforcing its rights in the Seller Intellectual Property, at Seller's expense, including making personnel available to testify and providing relevant documentation and information. Distributor shall become a co-party to litigation if Seller deems it advisable.

## 11. Term and Termination.

(a)     Term.   Subject to Section 11(b), the Term of this Agreement commences on the Effective Date and shall continue until March 31, 2025 (the "**Initial Term**"). Unless both parties consent in writing to renew the Agreement (a "**Renewal Term**") at least 90 days prior to the end of the Initial Term, this Agreement shall expire on March 31, 2025.   The Initial Term and all Renewal Terms are collectively, the "**Term**."

(b)     Termination.   This Agreement may be terminated by notice to the non-terminating party at any time during the Term:

(i) Immediately, by either party, if a court of competent jurisdiction or governmental authority, regulatory or administrative agency or commission shall have enacted any law, statute, rule, or regulation or issued any final and non-appealable order or decree that permanently restrains, enjoins, or otherwise prohibits either party from performing or substantially performing under this Agreement;

(ii) Except as limited by law, by either party upon any voluntary or involuntary bankruptcy or insolvency of the other party, or if any action or proceeding is instituted against the other party relating to any of the foregoing and such action or other proceeding is not dismissed within 60 days after institution thereof;

(iii) By either party if the other party has breached or failed to comply with any material term or condition required to be performed or complied with by such other party, and such breach or failure is not cured within 30 days after notice thereof by the terminating party;

(iv) By Distributor as set forth in Sections 2 and 3(b)(ii);

(v) By Seller as set forth in Section 4 and 19(i);

(vi) By Seller if Distributor fails to meet its Volume Targets;

(vii) By Seller if Distributor fails to meet its Overall Volume Targets;

and

(viii) By Seller if the Direct Buying Customers fail to meet their quarter or calendar year Overall Volume Targets.

(c)     Material Obligations. For purposes of Section 11(b)(iii), each of the following Sections or subsections shall be deemed a "material term or condition" of this Agreement without any further obligation of either party to prove materiality: Sections 1(b), 1(h),

3(b)(ii), 4, 5(a)(ii), 5(a)(iii), 5(a)(iv), 9, 10, 11(d), 12, 14, and 16 and the subsections of the foregoing (if any); provided, however, that the foregoing does not imply that other provisions of this Agreement are not deemed to be "material terms and conditions."

(d)    Special Termination Rights for Bribery, Kickback and Related Remedies. If Distributor breaches Section 1(b), 1(h) or Section 4, Seller may elect one or more of the following remedies:

(i) Seller may terminate this Agreement without the opportunity for Distributor to cure;

(ii) Apply a Liquidated Damage Amount as calculated below per each violation for the harm caused to Seller for such breaches. The parties acknowledge that the liquidated damages Distributor shall pay to Seller as a result of breaches of Section 1(b), 1(h) or Section 4 by Distributor, its employee(s), or agent(s) and that these amounts are reasonable estimates of Seller's damages in accordance with applicable state law. The assessment of liquidated damages shall not constitute a waiver or release of any other remedy Seller may have under this Agreement for Distributor's breach of this Agreement, including without limitation, Seller's right to terminate this Agreement, and Seller shall be entitled in its discretion to recover actual damages caused by Distributor's unauthorized acts and/or failure to perform its obligations under this Agreement. However, Seller shall reduce such actual damages by the amounts of liquidated damages received for the same events causing the actual damages. "Liquidated Damage Amount" is calculated as follows: the higher of $10,000.00, and 1% of total amount of Products invoiced to Distributor over the twelve (12) months immediately prior to the date (as determined by Distributor) of Seller becoming aware of such violations.

(e)    Rights of Parties Upon Termination or Expiration. The following provisions shall apply upon the termination or expiration of this Agreement:

(i) No New Solicitations or Sales. Unless permitted under Section 11(e)(vii)(2), Distributor shall cease soliciting orders for Products.

(ii) Final Reports. Within 10 days following the effective date of termination or expiration, Distributor shall deliver to Seller a final Monthly Sales Report.

(iii) Confidential Information. Distributor shall return to Seller, and immediately cease all use of, Confidential Information previously furnished by Seller then in Distributor's possession or control.

(iv) Registrations. Distributor shall, in consultation and coordination with Seller, promptly take such action as is necessary to (1) terminate Distributor's registration as an authorized distributor of Products with any applicable governmental authority, if any such registration was required, and (2) transfer to Seller (or to a party designated by Seller) product registrations, licenses, and other import, and sales related rights and documents.

(v) Amounts Owed to Seller. All indebtedness of Distributor to Seller shall become immediately due and payable without any further notice or demand, which notice or demand is hereby expressly waived by Distributor, and Seller shall be entitled to reimbursement for any reasonable attorneys' fees and court costs that it may incur in collecting or enforcing payment of such obligations.

(vi) Licenses: No Further Authority. Except in connection with the sale of Products under Section 11(e)(vii)(2), the licenses granted to Distributor under Section 10(a) will be deemed terminated and any authority that Distributor was granted under this Agreement or otherwise to represent itself to the public as an authorized dealer, distributor, sales agent, or other representative of Seller or any of its Affiliates will be deemed revoked. Distributor shall remove from its property and immediately discontinue all use, directly or indirectly, of the Licensed Items. Distributor shall, upon request, certify in writing to Seller that Distributor has completely terminated its use of any and all such Licensed Items which appeared in or upon any item or materials used in conjunction with Distributor's business. After the termination or expiration of this Agreement, Distributor shall not represent itself as, or hold itself out to the public as, an authorized servicer of any Products or any of Seller's or its Affiliates other products.

(vii) Buy-Back or Sell-Off Period.

(1)    Buy-Back. Within a reasonable period of time after the effective date of termination or expiration of this Agreement, Seller may repurchase from Distributor any Products that are in Distributor's inventory (or arrange for purchase by a third party), provided that they are new, in original packaging, and in good and saleable condition, unaltered, and are not expired, and in all cases subject to inspection by Seller. Any such repurchase of Distributor's inventory of Products shall be at a price paid by Distributor for the Products, net of any rebates or discounts. Repurchased inventory shall be shipped by Distributor freight and insurance prepaid, according to Seller's instructions. Seller shall pay Distributor for such repurchased Products within 30 days after receipt of such Products at a facility designated by Seller and subject to Seller's inspection, testing, and acceptance of such Products.

(2)    Sell-Off. Subject to Seller's election to buy-back Products, Distributor may sell any Products in its inventory to existing or prospective Customers provided that all such sales occur within 90 days after notice of termination or expiration of this Agreement. All such sales shall be subject to the terms and conditions of this Agreement. After such 90 day, Distributor shall not make any further sales of Products and shall be solely responsible for disposing of any remaining inventory in accordance with Applicable Law.

(f)    Acknowledgement. Each party acknowledges that the terms and conditions of this Agreement will remain in full force and effect between: (i) the date either party provides notice of its intent not to renew this Agreement under Section 11(a) or notice of any termination under Section 11(b); and (ii) the effective date of such expiration or termination.

(g)    Survival. Sections 3(c) (Payment Terms; Currency), 3(d) (Responsibility for Taxes and Duties), 3(j) (Past Due Accounts), 5(a)(i)-5(a)(iv) (Incident Reports), 9 (Records and Audits), 10(c) (Ownership; Goodwill), 11(e) (Rights of Parties Upon Termination or Expiration), 11(g) (Survival), 12(b) (Products), 12(c) (Disclaimer of Additional Warranties), and 13 (Indemnification) through 19 (Miscellaneous) and the definitions of any defined terms used in the foregoing survive the expiration or earlier termination of this Agreement.

(h)    Absolute Nature. The right of termination, as provided herein, is absolute and the parties recognize that termination of this Agreement may result in loss or damage to either party, but hereby expressly acknowledge that neither party shall be liable to the other by reason of any loss or damage resulting from the termination of this Agreement by the other whether for cause or without cause including any loss of prospective profits, or any damage occasioned by loss of goodwill or by reason of any expenditures, investments, leases or commitments made in anticipation of the continuance of this Agreement. Without limiting the generality of the foregoing reciprocal releases of liability for loss or damage occasioned by termination, Distributor acknowledges that Seller may, at any time, be at liberty to negotiate with and appoint any other person, firm or corporation with respect to the replacement of Distributor in whole or in part as a distributor of Seller's products, and Seller shall not be liable or

113875732

responsible to Distributor for any loss of profits or other damage that may be suffered by Distributor by reason of any publicity attendant upon any such negotiation or appointment or otherwise.

## 12. Representations and Warranties.

(a)    By Both Parties. Each party represents and warrants to the other party that (i) it has the requisite right, power, and authority to enter into and perform under this Agreement, (ii) the execution, delivery, and performance of this Agreement by it will not result in the breach of, constitute a default under, or interfere with its organizational and governing instruments and agreement or any other contract, instrument, or obligation, whether written or oral, to which it is currently bound or violate any writ, order, injunction, decree, or any law, statute, rule, or regulation applicable to it, and (iii) this Agreement has been duly authorized, executed, and delivered by such party and constitutes a binding obligation of such party enforceable in accordance with its terms.

(b)    Products.    SELLER MAY EXTEND LIMITED EXPRESS WARRANTIES SOLELY TO END USERS OF PRODUCTS AND MAKES NO EXPRESS OR IMPLIED WARRANTIES OF ANY KIND TO DISTRIBUTOR OR CUSTOMERS WITH RESPECT TO PRODUCTS. Distributor shall make no warranties, representations, covenants or indemnities, either orally or in writing, to anyone on behalf of, or in the name of, Seller.

(c)    Disclaimer of Additional Warranties. EXCEPT FOR THE EXPRESS WARRANTIES CONTAINED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES TO THE OTHER OR TO ANY OTHER PERSON. ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED.

## 13. Indemnification.

(a)    Indemnification. Each party shall indemnify, defend and hold harmless (**"Indemnifying Party"**) the other party, and its Affiliates, and their respective directors, officers, suppliers, agents, and employees (collectively, the **"Indemnified Party"**), from and against any third party claims, demands, investigations, suits, or causes of action, including damages, fines, penalties, other costs and attorney's fees in connection with the adjudication of the Claims for which Indemnifying Party is required to defend the Indemnified Party, or any settlement of such claims (each, a **"Claim"**) relating to or arising out of (i) the Indemnifying Party's breach of this Agreement; (ii) the gross negligence or willful misconduct of the Indemnifying Party.

(b)    Indemnification Process.    A party's obligations to indemnify the other party with respect to any Claim shall be conditioned upon the Indemnified Party: (i) providing the Indemnifying Party with prompt written notice of such Claim (provided that failure to provide such notice shall not relieve the Indemnifying Party from its obligations under this Section 13 unless the Indemnifying Party's ability to defend or settle the subject Claim has been materially prejudiced), (ii) permitting the Indemnifying Party to assume and solely control the defense of such Claim and all related settlement negotiations, with counsel chosen by the Indemnifying Party, and (iii) cooperating at the Indemnifying Party's request with the defense or settlement of such Claim, which cooperation shall include providing reasonable assistance and information at no cost to the Indemnifying Party. The Indemnifying Party may not settle any Claim unless the terms of the settlement include a full release of the Indemnified Party and does not involve any payment or performance by the Indemnified Party. The Indemnified Party shall have the right to approve any settlement in which the Indemnified Party is required to admit any culpability or that would in the Indemnified Party's

reasonable opinion damage its business reputation. Nothing herein will restrict the right of a party to participate in a Claim through its own counsel and at its own expense.

## 14. Insurance Requirements.

(a)    Insurance Requirements.    Each party shall carry at its expense during the entire Term and for three years after its termination, commercial general liability insurance written on an occurrence basis, with a combined single limit of not less than $1,000,000 per occurrence for personal injury and property damage. The amounts of insurance required herein may be satisfied by purchasing coverage for the limits specified or by any combination of underlying and umbrella limits, so long as the total amount of insurance is not less than $2,000,000 combined single limit and aggregate limit. Coverage should be placed with a reputable or financially responsible carrier or carriers with a minimum A.M. Best rating of A-. Each party shall cause its insurers to endorse the required insurance hereunder to waive any rights of subrogation against the other party and its Affiliates. Each party shall, or shall cause its insurer to provide to the other party at least 30 days' prior written notice of any cancellation or reduction in coverage. Upon execution of this Agreement, and thereafter 10 days prior to any renewals, upon request of a party, the other party shall provide the other party with a Certificate of Insurance, and applicable additional insured endorsements evidencing the coverage required by this Agreement, and identifying the Certificate Holder as the requesting party. Each party shall mail or send electronic copies of all Certificates of Insurance to the notification address set forth in Section 19(a) of this Agreement or as otherwise provided by a party for delivery of such certificates.

(b)    Sufficiency of Insurance; Cooperation with Insurer. By requiring insurance herein, a party does not represent that the coverage and limits will necessarily be adequate to protect the other party, its indemnitees, and insurance effected or procured by a party shall not reduce or limit its contractual obligation to indemnify and defend the other party and its indemnitees as contemplated in this Section 14. Distributor and Seller shall fully cooperate, participate and comply with all reasonable requirements and recommendations of the insurers and insurance brokers issuing or arranging for the issuance of the insurance policies required hereunder, in all areas of safety, claims reporting and investigating, and audit procedures.

## 15. Limitations on Liability.

(a)    Limitation on Certain Damages. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ANY SPECIAL, INDIRECT, PUNITIVE, OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING FOR LOST PROFITS, LOST SALES, LOST BUSINESS OPPORTUNITY, LOSS OF REPUTATION, PREVIOUS EXPENDITURES OR INVESTMENTS, OR GOODWILL) IN CONNECTION WITH ANY PRODUCTS SUPPLIED OR TO BE SUPPLIED HEREUNDER, OR ANY OTHER MATTER COVERED BY THIS AGREEMENT, REGARDLESS OF WHETHER SUCH LIABILITY IS BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, BREACH OF WARRANTY, OR ANY OTHER THEORY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)    Maximum Aggregate Liability. SUBJECT TO SECTION 15(C), IN NO EVENT SHALL SELLER'S MAXIMUM AGGREGATE LIABILITY TO DISTRIBUTOR OR ANY THIRD PARTY WITH RESPECT TO ANY AND ALL CLAIMS CONCERNING PRODUCTS OR ANY OTHER MATTER COVERED BY THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION, EXCEED THE AMOUNTS ACTUALLY PAID BY DISTRIBUTOR TO SELLER HEREUNDER DURING

113875732

THE TWELVE MONTH PERIOD IMMEDIATELY PRECEDING THE FIRST EVENT GIVING RISE TO SUCH LIABILITY.

(c) Exclusions. The limitations of liability set forth in Section 14(b) will not apply with respect to (i) each party's indemnification obligations under Section 13, (ii) the gross negligence or willful misconduct of a party, (iii) a breach by either party of its confidentiality obligations under Section 16, or (iv) a breach by Distributor of Section 1(b), 4, or 10. Nothing in this Agreement will exclude or limit any liability which cannot be excluded or limited under Applicable Law.

(d) Limitation on Actions. No action, suit, or proceeding arising out of or relating to this Agreement may be brought by either party more than two years after the first event giving rise thereto.

(e) Essential Part of the Bargain. Each of Distributor and Seller acknowledge that the limitations of liability set forth in this Section 15: (i) are an essential element of this Agreement, (ii) represent a deliberate and bargained for allocation of risk between the parties, (iii) were a material inducement to each party entering into this Agreement and the parties would not have entered into this Agreement without such limitations of liability, and (iv) are intended to be independent of any exclusive remedies available under this Agreement, including the failure of any such remedy to achieve its essential purpose.

**16. Confidentiality.** All non-public, confidential or proprietary information of Seller and Distributor, including, but not limited to, trade secrets, technology, information pertaining to business operations and strategies, and information pertaining to customers, pricing, and marketing (collectively, "Confidential Information"), disclosed by a party to the other party, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," in connection with this Agreement is confidential, and shall not be disclosed or copied by the receiving party without the prior written consent of the disclosing party. Confidential Information does not include information that is: in the public domain prior to the disclosure, known to a party at the time of disclosure; or rightfully obtained by the receiving party on a non-confidential basis from a third party not in violation of the terms herein. The receiving party agrees to use the Confidential Information only for the purposes of fulfilling its obligations or benefiting from its rights under this Agreement. The disclosing party shall be entitled to file for injunctive relief for any violation of this Section.

**17. Governing Law; Jurisdiction; Trial by Jury.** This Agreement will be governed by and interpreted in accordance with the internal laws of the State of California, without regard to conflicts of laws. Each party disclaims the applicability of the United Nations Convention on Contracts for the International Sale of Goods to this Agreement. The parties hereby consent to the exclusive jurisdiction of, and venue in, any federal or state court of competent jurisdiction located in the State and County of the Seller's principal place of business in the United States for the purposes of adjudicating any matter arising from or in connection with this Agreement. **Each party expressly waives any right to a trial by a jury in any proceeding arising directly or indirectly out of this Agreement.**

**18. Equitable Relief.** Seller may enforce any provision of this Agreement by obtaining equitable relief in addition to all other remedies at law or under this Agreement. Seller's remedies at law for a breach of any provision of this Agreement are inadequate and Seller shall suffer irreparable harm from any such breach.

**19. Miscellaneous.**

(a) Notice. Other than routine communications made in the ordinary course of performing any obligations under this Agreement, all notices or other communications required or permitted to be given

under this Agreement must be in writing and will be deemed to have been sufficiently given when delivered in person (with written confirmation of receipt), on the second business day after mailing via a responsible international courier, or on the fifth business day after mailing by first class registered or certified mail, postage prepaid, to the address stated on the first page of this Agreement or to such other address or individual as either party may specify from time to time in writing or transmitted electronically if confirmed in writing by one of the above methods.

(b) Waiver. No term or provision of this Agreement will be considered waived and no breach consented to by either party unless such waiver or consent is in writing and signed on behalf of the party against whom it is asserted and such writing includes a specific statement of such party's intent to make such waiver or consent. No consent to or waiver of a breach of this Agreement by either party, whether express or implied, will constitute a consent to, waiver of, or excuse for any other, different, or subsequent breach of this Agreement by such party.

(c) Conflicts of Interest. If either party becomes aware of a conflict of interest relating to this Agreement, such party shall immediately notify the other party thereof and the parties shall work in good faith to resolve the conflict or otherwise resolve the situation.

(d) Modification. Amendments and modifications to this Agreement will be effective only if written and signed by both parties.

(e) Assignment. Distributor acknowledges that Seller is entering into this Agreement in reliance upon the personal reputation, qualifications, and abilities of the present owner or owners and employees of Distributor's business and operations. Accordingly, Distributor shall not assign or transfer this Agreement or any of its rights, or delegate any of its duties or obligations, under this Agreement, whether voluntarily, by merger or operation of law, or otherwise, except with the prior consent of Seller. A change in control of Distributor's business shall be deemed to be a prohibited assignment under this Section 19(e). For the purposes of this Section 19(e), **"change of control"** means the sale or transfer of a majority of the share capital (or right to direct the operations) of Distributor, or the sale or transfer of a substantial portion of its business or assets or a similar type of transaction. Distributor shall not employ or otherwise use any third parties to perform its obligations under this Agreement or in any substantive manner for the benefit of Seller, without first identifying all such third parties to Seller and obtaining Seller's advance written approval for their employment or use. This Agreement may be assigned by Seller, without the consent of Distributor, to (i) any Affiliate of Seller, (ii) any entity with which or into which Seller may consolidate or merge, or (iii) any entity acquiring all or substantially all of the assets of Seller relating to this Agreement. In addition, Seller shall have to right to delegate any of its obligations hereunder to an Affiliate or to an agent of Seller. Any assignment, transfer, or delegation in contravention of this Section 19(e) will be null and void. This Agreement will inure to the benefit of the successors and assigns of Seller.

(f) Entire Agreement. This Agreement and written orders subject to this Agreement entered into by the parties from time to time hereunder constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. This Agreement supersedes all prior and simultaneous representations, discussions, negotiations, letters, proposals, agreements, and understandings between the parties with respect to the subject matter hereof, whether written or oral. Without limiting the generality of the foregoing, each party hereby acknowledges that any other distribution, sales agency, authorization letters, or other agreements (whether written or oral) relating to the promotion or sale of products of Seller or its Affiliates are hereby superseded and each party hereby waives all rights it may have to

113875732

assert claims, whether known or unknown, in connection with, relating to, or arising under such superseded agreements, provided however, that any payment and service obligations of Distributor shall survive. In the event of any conflict or inconsistency between the terms of this Agreement and any order hereto, this Agreement will control, except as specifically stated otherwise.

(g)     No Rights by Implication.   No rights or licenses with respect to Products or the Seller Intellectual Property are granted or deemed granted hereunder or in connection herewith, other than those rights expressly granted in this Agreement.

(h)     Cumulative Remedies.  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law, in equity or otherwise, except to the extent expressly provided in this Agreement to the contrary.

(i)     Force Majeure; Other Events.  Neither party shall be considered in default of its performance of any obligation hereunder (other than an obligation to make any payment due hereunder) to the extent that performance of such obligation is prevented or delayed by acts of God; acts of the other party; war (declared or undeclared); terrorism or other criminal conduct; fire; flood; weather; sabotage; strikes, or labor or civil disturbances; governmental requests, restrictions, laws, regulations, orders, omissions or actions; pandemics; unavailability of, or delays in, utilities or transportation; default of suppliers or other inability to obtain necessary materials; embargoes, or unforeseen circumstances or any other similar or dissimilar events or causes beyond party's reasonable control (each, a **"Force Majeure Event"**).  If any Force Majeure Event does arise, occur, or result, the party subject thereto shall use commercially reasonable efforts to minimize the consequences of such event and to overcome such event as soon as reasonably possible.  A party desiring to rely upon any Force Majeure Event as an excuse for failure, default, or delay in performance shall provide the other party with prompt written notice of the facts giving rise to said event when it arises and of the cessation of said event when it ceases to exist.  If Distributor is unable to substantially perform its obligations under this Agreement as a result of a Force Majeure Event for more than 30 days, Seller shall have the option to terminate this Agreement upon written notice to Distributor.

(j)     Severability.  If any provision in this Agreement is invalid or unenforceable in any circumstances, its application in any other circumstances and the remaining provisions of this Agreement will not be affected thereby.

(k)     No Third Party Beneficiaries.  Except as expressly stated herein, each party intends that this Agreement will not benefit, or create any right or cause of action in or on behalf of, any person or entity other than the parties hereto, Seller's Affiliates, and their successors and permitted assigns.

(l)     Interpretation.  For purposes of this Agreement, (i) the words "include," "includes" and "including" will be deemed to be followed by the words "without limitation"; (ii) references to any gender include all genders; (iii) the word "or" is disjunctive but not necessarily exclusive; and (iv) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The headings in this Agreement are for reference only and will not affect the interpretation of this Agreement.

(m)     Further Assurances.  Distributor shall, at its own expense, take such steps and execute and deliver such documents as may be required to satisfy any law or requirements in any jurisdiction where

Distributor distributes Products as authorized by this Agreement.

(n)     Execution.    This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

## Schedule A
### Volume Targets

Shisha Aroma, Inc

Base Program Volume Target
Base + Program Volume Target
Global Hookah/Hookah Wholesale

Overall Volume Target - Base Program
Overall Volume Target - Base + Program

113875732

**Schedule B**

**Incentives**

Q1 2023 – No Incentive

Q2 2023 – No Incentive

Q3 2023 – Q4 2023 - $5 per Product purchased during the quarter if the Base Program Overall Volume Target is achieved for the specific quarter by Direct Buying Customers, due within fifteen days following the end of the quarter; plus $5 per Product purchased if the Base Program 2023 calendar year Overall Volume Target is achieved by Direct Buying Customers to be paid in April 2024; plus $5 per Product purchased if the Base + Program 2023 calendar year Overall Volume Target is achieved by the Direct Buying Customers to be paid in April 2024.

Q1 2024 – Q4 2024 - $5 per Product purchased during the quarter if the Base Program Overall Volume Target is achieved for the specific quarter by Direct Buying Customers, due within fifteen days following the end of the quarter; plus $5 per Product purchased if the Base Program 2024 calendar year Overall Volume Target is achieved by Direct Buying Customers to be paid in April 2025; plus $5 per Product purchased if the Base + Program 2024 calendar year Overall Volume Target is achieved by the Direct Buying Customers to be paid in April 2025.

Q1 2025 - $5 per Product purchased during the quarter if the Base Program Overall Volume Target is achieved for the specific quarter by Direct Buying Customers, due within fifteen days following the end of the quarter; plus $5 per Product purchased if the Base Program 2025 calendar year Overall Volume Target is achieved by Direct Buying Customers to be paid in April 2026; plus $5 per Product purchased if the Base + Program 2025 calendar year Overall Volume Target is achieved by the Direct Buying Customers to be paid in April 2026.

113875732

Schedule C

**Personal Guarantee Requirements**

In consideration of mutual covenants contained in the forgoing Agreement, I Ramzi Heifawi (the **"Undersigned"**) assume personal and individual responsibility and liability, and unconditionally guaranty, without offset, the payment of all indebtedness due and payable to Seller by the Distributor which is now existing or hereafter incurred in the future including payment of interest, attorney's fees and court costs. This guaranty is open, continuous, and not limited in time. Seller shall not be required to exhaust its remedies against Distributor prior to enforcing its rights against the Undersigned under this personal guaranty. The Undersigned waives notice of default, demand, non-payment, presentment, and notice of intent to accelerate or acceleration. I understand that this guaranty shall remain in full force and effect until Distributor and Undersigned receives written notice from Seller that this guaranty is terminated. In the event that it becomes necessary to place this personal guaranty with an attorney and/or third party for collection, the Undersigned agrees to pay all attorney fees, court costs and/or costs of collection.

I hereby consent and authorize the use of my consumer credit report in the credit evaluation process by Seller. Undersigned grants to Seller the right and authority to make credit inquiries regarding Undersigned and to obtain financial statements, consumer credit reports, or other credit information about Undersigned, from time to time as may be needed, in the credit evaluation process. Undersigned does hereby release all claims in favor of Undersigned against Seller and third parties related to the request and/or providing of credit information and instruments.

**UNDERSIGNED:**                                **WITNESS:**

By: _____                By: _____
          Signature                                          Signature

President _____                Nihad Mkhinini _____
          Printed Name                                       Printed Name

Ramzi Haifawi _____                Friend _____
          Title                                              Title

3/9/2023 _____                3/9/2023 _____
          Date                                               Date